**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TOHONO O'ODHAM NATION;
SAN CARLOS APACHE TRIBE;
ARCHAEOLOGY SOUTHWEST;
CENTER FOR BIOLOGICAL
DIVERSITY,

    *Plaintiffs - Appellants*,

  v.

UNITED STATES DEPARTMENT
OF THE INTERIOR; DEB
HAALAND; UNITED STATES
BUREAU OF LAND
MANAGEMENT,

    *Defendants - Appellees*,

SUNZIA TRANSMISSION, LLC,

    *Intervenor - Defendant - Appellee*.

No. 24-3659

D.C. No.
4:24-cv-00034-
JGZ

OPINION

Appeal from the United States District Court
for the District of Arizona
Jennifer G. Zipps, Chief District Judge, Presiding

Argued and Submitted March 26, 2025
Phoenix, Arizona

Filed May 27, 2025

Before: Susan P. Graber, Marsha S. Berzon, and Mark J.
Bennett, Circuit Judges.

Opinion by Judge Bennett

## SUMMARY[*]

### National Historic Preservation Act

The panel reversed the district court's order dismissing for failure to state a claim an action brought by Tohono O'odham Nation and others ("Plaintiffs") alleging that the Department of the Interior violated the National Historic Preservation Act ("NHPA") by issuing two limited notices to proceed ("LNTPs") before satisfying its NHPA obligations.

In 2023, the Department issued LNTPs, which authorized SunZia Transmission, LLC to begin construction of a transmission line that runs through the San Pedro Valley. Plaintiffs contended that the Valley is a "historic property" protected under the NHPA.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

As a threshold matter, the panel held that the LNTPs constituted final agency actions because they represent the Department's final decision that the requirements for a Programmatic Agreement ("PA"), a statutorily authorized negotiated agreement that governs the implementation of the Project, had been satisfied, and that SunZia could therefore begin construction in the San Pedro Valley. Plaintiffs' NHPA claim, which pertained to the LNTPs, was thus reviewable and timely under the Administrative Procedure Act.

The panel held that Plaintiffs plausibly alleged that the Department violated the PA by failing to consult with Plaintiffs on a historic property treatment plan that would evaluate whether the Valley should be designated as a historic property. Accordingly, the panel inferred that a proper consultation would have resulted in the Valley being designated as such. Thus, Plaintiffs also plausibly alleged that the Department violated the PA by authorizing construction before properly identifying all historic properties affected by the Project and ensuring that any adverse effects would be avoided, minimized, or mitigated.

## COUNSEL

Elizabeth L. Lewis (argued) and William S. Eubanks II, Eubanks & Associates PLLC, Washington, D.C.; Howard M. Shanker, Attorney General, Tohono O'odham Nation, Office of the Attorney General, Sells, Arizona; Bernardo M. Velasco, Assistant Attorney General; Alexander B. Ritchie, Attorney General; San Carlos Apache Tribe, Office of the Attorney General, San Carlos, Arizona; for Plaintiffs-Appellants.

Ezekiel A. Peterson (argued), Devon L. McCune, Amber Dutton-Bynum, and Andrew M. Bernie, Attorneys, Environment & Natural Resources Division; Todd Kim, Assistant Attorney General; United States Department of Justice, Washington, D.C.; Michael Smith and Benjamin Vaccaro, Attorneys, Office of the Solicitor, United States Department of the Interior, Washington, D.C.; for Defendants-Appellees.

Svend A. Brandt-Erichsen (argued), Nossaman LLP, Seattle, Washington; Brian Imbornoni, Nossaman LLP, Phoenix, Arizona; Hilary C. Tompkins, Hogan Lovells US LLP, Washington, D.C.; for Intervenor-Defendant-Appellee.

Wesley J. Furlong and Kirsten D. Gerbatsch, Native American Rights Fund, Anchorage, Alaska; Morgan E. Saunders, Native American Rights Fund, Washington, D.C.; for Amicus Curiae National Association of Tribal Historic Preservation Officers.

# OPINION

BENNETT, Circuit Judge:

Plaintiffs-Appellants are the Tohono O'odham Nation, the San Carlos Apache Tribe, Archaeology Southwest, and the Center for Biological Diversity (collectively, "Plaintiffs"). Plaintiffs filed suit under the Administrative Procedure Act ("APA") against the Department of the Interior, the Secretary of the Interior, and the Bureau of Land Management ("BLM") (collectively, "Department"). In 2023, the Department issued two limited notices to proceed ("LNTPs"), which authorized SunZia Transmission, LLC ("SunZia") to begin construction of a transmission line ("Project") that runs through the San Pedro Valley (or "Valley"). According to Plaintiffs, the Valley is a "historic property" protected under the National Historic Preservation Act, 54 U.S.C. § 300101 *et seq.* ("NHPA"). Plaintiffs allege that the Department violated the NHPA by issuing the LNTPs before satisfying its NHPA obligations. Those obligations are set forth in a Programmatic Agreement ("PA"), a statutorily authorized negotiated agreement that governs the implementation of the Project. The district court allowed SunZia to intervene as a defendant.

After denying Plaintiffs' motion for a preliminary injunction,[1] the district court granted the Department's and SunZia's (collectively, "Defendants'") motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The district court also denied leave to amend based on futility. Plaintiffs timely appeal the district court's

---

[1] The district court's denial of the preliminary injunction is not at issue.

grant of the motions to dismiss, and we have jurisdiction under 28 U.S.C. § 1291.

Plaintiffs' only preserved claim is that the Department violated the NHPA by issuing the LNTPs without first meeting certain of its obligations under the PA. Those obligations include the requirement that the Department consult with Plaintiffs on a historic property treatment plan by providing Plaintiffs with a copy of the plan for review and comment and the requirement that the Department properly identify all historic properties affected by the Project and avoid, minimize, or mitigate any adverse effects to historic properties before authorizing construction. The LNTPs were the Department's decision that the PA obligations had been satisfied, and that SunZia could therefore begin construction in the Valley. We hold that Plaintiffs' challenge to the LNTPs is reviewable and timely under the APA.

On the merits of the motions to dismiss, construing the complaint in Plaintiffs' favor and considering documents incorporated into the complaint or subject to judicial notice, we determine that Plaintiffs have plausibly alleged that the Department violated the PA by failing to consult with Plaintiffs on a historic property treatment plan that would evaluate whether the Valley should be designated as a historic property. Further, because Plaintiffs have plausibly alleged that the Valley is a historic property, we must infer that a proper consultation would have resulted in the Valley being designated as such. Thus, Plaintiffs also have plausibly alleged that the Department violated the PA by authorizing construction *before* properly identifying all historic properties affected by the Project and ensuring that any adverse effects would be avoided, minimized, or mitigated. We therefore reverse and remand.

# I. BACKGROUND AND PROCEDURAL HISTORY

## A. Legal Background

Section 106 of the NHPA provides that agencies "shall take into account the effect of [an] undertaking on any historic property" and "afford the [Advisory Council on Historic Preservation ('Advisory Council')] a reasonable opportunity to comment with regard to the undertaking."[2] 54 U.S.C. § 306108.[3] The NHPA is "chiefly procedural in nature," requiring agencies to "generat[e] information about the impact of federal actions on" historic properties and to "carefully consider the information produced." *The Pres. Coal., Inc. v. Pierce*, 667 F.2d 851, 859 (9th Cir. 1982). If an undertaking, like the Project here, will have adverse effects on historic properties, agencies—in consultation with certain interested parties—must "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate [those] adverse effects on historic properties." 36 C.F.R. § 800.6(a). In short, "Section 106 of NHPA is a 'stop, look, and listen' provision that requires each federal agency to consider the effects of" an undertaking on historic properties. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999) (per curiam) (quoting *Apache Survival Coal. v. United States*, 21 F.3d 895, 906 (9th Cir. 1994)).

---

[2] As relevant here, an "undertaking" is "a project . . . funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those requiring a Federal permit, license, or approval." 54 U.S.C. § 300320(3). It is undisputed that the Project qualifies as an "undertaking" under the NHPA.

[3] This provision was originally enacted by Section 106 of the National Historic Preservation Act. Pub. L. No. 89-665, § 106, 80 Stat. 915, 917 (1966).

Under the NHPA, "'historic property' means any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register [of Historic Places ('National Register')], including artifacts, records, and material remains relating to the district, site, building, structure, or object." 54 U.S.C. § 300308. To be eligible for inclusion on the National Register, properties must meet the criteria set forth in 36 C.F.R. § 60.4.

"Traditional Cultural Place" ("TCP"), formerly "Traditional Cultural Property," is a term used by the National Park Service to refer to a place listed in, or eligible for listing in, the National Register because it has "significance to a living community because of its association with cultural beliefs, customs, or practices that are rooted in the community's history and that are important in maintaining the community's cultural identity." Nat'l Park Serv., *Identifying, Evaluating, and Documenting Traditional Cultural Places National Register Bulletin* 1 (2024), https://parkplanning.nps.gov/document.cfm?parkID=442&projectID=107663&documentID=141175; *see also id.* at 100. A TCP can be a "landscape or geographic feature." *Id.* at 10. Because a TCP "must meet the criteria for listing in the National Register," a TCP is essentially a type of historic property protected under the NHPA. *Id.* at 19.

The Advisory Council's regulations set forth how agencies may meet their Section 106 obligations. 36 C.F.R. § 800.1(a). Under the regulations, the "[Advisory] Council and the agency . . . may negotiate a programmatic agreement to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings." *Id.* § 800.14(b).

"Compliance with the procedures established by an approved programmatic agreement satisfies the agency's section 106 responsibilities for all individual undertakings of the program covered by the agreement until it expires or is terminated . . . ." *Id.* § 800.14(b)(2)(iii).

## B. Factual Background[4]

In 2008, SunZia applied to the BLM for a right-of-way to construct and operate the Project: two 500-kilovolt transmission lines and related facilities between central New Mexico and central Arizona. The Project would extend about 500 miles and cross federal, state, and private lands, including about 180 miles of BLM-managed land. The Project would increase transmission capacity, improve reliability, and encourage generation of renewable energy.

As part of its review of SunZia's application, the BLM first conducted an environmental review under the National Environmental Policy Act ("NEPA") and issued a Final Environmental Impact Statement in June 2013. The BLM also began the NHPA Section 106 process by negotiating a programmatic agreement to govern its Section 106 obligations. Two of the Plaintiffs here—the Tohono O'odham Nation and the San Carlos Apache Tribe—

---

[4] These facts are taken from the complaint and the following documents, which the parties agree were either incorporated into the complaint by reference or are subject to judicial notice: the 2015 Record of Decision, the PA, and the LNTPs. *See Mauia v. Petrochem Insulation, Inc.*, 5 F.4th 1068, 1071 (9th Cir. 2021) ("Our review [of a Rule 12(b)(6) motion to dismiss] is limited to the complaint, materials incorporated by reference into the complaint, and matters of which we may take judicial notice."). Because this case is at the motion-to-dismiss stage, we construe the allegations in the complaint in the light most favorable to Plaintiffs, the non-moving parties. *See id.*

participated in the development of the programmatic agreement.  The final PA was executed in December 2014.

On January 23, 2015, the BLM issued its Record of Decision ("ROD"), granting SunZia a right-of-way for the Project.  The ROD explains that the BLM approved a specific 515-mile route for the transmission line, originating in Lincoln County, New Mexico, and terminating in Pinal County, Arizona ("Route").  The width of the Route varies between 400 and 1,000 feet.  The Route was selected, in part, because it would "maximize use of existing utility corridors and infrastructure" and "minimize impacts to sensitive resources."  As relevant here, a portion of the Route runs through the San Pedro Valley, northeast of Tucson.  The Valley is of great historic and cultural importance to several Native American Tribes, including the Tohono O'odham Nation, the San Carlos Apache Tribe, the Hopi Tribe, and the Zuni Pueblo.  The complaint alleges that the San Pedro Valley as a whole, and/or places within it, are TCPs.

Although the ROD grants the right-of-way for the Route, the ROD "does not authorize [SunZia] to commence construction of any Project facilities or to proceed with other ground-disturbing activities in connection with the Project on federal lands."  Instead, the ROD provides that SunZia "*shall not* commence construction or proceed with ground-disturbing activities until [it] . . . receives and accepts the right-of-way grant, *and also* receives a written Notice to Proceed." (emphases added).  The ROD also states that the right-of-way grant is "subject to the terms, conditions, [and] stipulations . . . reflected in this ROD."  These conditions include the requirements set forth in the PA.  The ROD explains that the "identification and evaluation process provided in the PA will be completed *after the ROD* and right-of-way permit are issued, but prior to Project

construction." (emphasis added). The requirements set forth in the PA must be satisfied before a notice to proceed is issued.

As relevant here, the PA requires SunZia to prepare a draft inventory report for each state identifying cultural resources that could be affected by the Project and assessing the effects of the Project on the resources.[5] SunZia must submit its draft inventory report to the BLM for review, and the BLM then must provide the draft inventory report to certain interested parties, including tribes, for comment. The BLM "shall ensure that comments received within 60 calendar days [of distribution of a draft inventory report] are considered in development of [any] revised Inventory Report[]."

The final inventory report must identify historic properties eligible for inclusion on the National Register and provide determinations of eligibility for the Register. In addition to the opportunity to comment on the draft report, interested tribes must also be provided "opportunities for review and comment on . . . final versions of the Inventory Report." In determining whether properties are eligible for inclusion on the National Register, the BLM must "consider[] all comments received from the Consulting Parties."[6] The PA also states more generally, without any

[5] As relevant here, the PA defines "cultural resources" as "places that possess historic and/or cultural significance" which "have not been evaluated for [National Register] eligibility." The properties "may be but are not necessarily eligible for the [National Register]."

[6] The PA defines "Consulting Party" as "[a]ny party that has participated in the development of this PA and has indicated intent to participate in consultations during its implementation either by signing in concurrence

timing limitations, that "[f]or properties that have traditional cultural values, the BLM shall take into consideration values expressed by the consulted tribes" in "making determinations of [National Register] eligibility."

After the inventory phase, SunZia must prepare a Historic Properties Treatment Plan ("Treatment Plan") for each state that addresses the effects of the Project on historic properties. The Treatment Plan must also "[i]dentify cultural resources that will be affected by the [Project] for which [National Register] eligibility determinations could not be made [during the inventory phase], and . . . specify the strategy for determining eligibility."

The Treatment Plan is subject to approval by the BLM after consultation with the Consulting Parties. The BLM must provide the Consulting Parties with a copy of the Treatment Plan for review and comment and must "ensure that all comments are taken into consideration in finalizing the [Treatment Plan]." Under the PA, "[t]he BLM shall, if possible, avoid adverse effects to all types of historic properties, with input from Consulting Parties." Avoidance measures "may include (but are not limited to) realignment of the transmission line." "Where avoidance is not possible, the BLM shall minimize or mitigate adverse effects to historic properties, if possible, with input from Consulting Parties." Measures to resolve adverse effects should be considered when developing the Treatment Plan.

The PA also sets forth conditions that must be met before the BLM may authorize construction. "Requests for

---

or by written notification to the Agency Official." The Consulting Parties included three of the Plaintiffs: the Tohono O'odham Nation, the San Carlos Apache Tribe, and Archeology Southwest.

authorizations of construction will be approved only if such authorizations will not restrict subsequent measures to avoid, minimize or mitigate the adverse effects to historic properties through rerouting of the corridor, or placement of ancillary facilities." If there are no historic properties present, then "[u]pon the BLM's acceptance of the final Inventory Report . . . , the BLM, at its discretion, . . . may authorize [SunZia] to begin construction on lands." If historic properties are present, then BLM may authorize construction after "acceptance of the [Treatment Plan]" if "all effects to historic properties and unevaluated cultural resources will be avoided," or upon "acceptance of [a report] of treatment that has occurred" if there will be any adverse effects on historic properties.

The PA contains a dispute resolution provision, providing that "[s]hould any Consulting Party to this PA object at any time to any actions proposed or the manner in which the terms of this PA are implemented, the BLM shall consult with such party to resolve the objection." If the objection cannot be resolved, the BLM must seek the advice of the Advisory Council. The BLM must then prepare a written response that considers the advice from the Advisory Council (if any) and comments from the Consulting Parties and provide those parties with a copy of the written response. The BLM may then make a final decision on the dispute.

With that background, we turn to Plaintiffs' allegations that the Department violated the NHPA by failing to meet certain of its obligations under the PA. Plaintiffs allege that the San Pedro Valley and/or places within the San Pedro Valley are TCPs. Many tribal members are descendants of people who lived in the Valley. Thus, the tribes have deep historical, cultural, and spiritual connections to the Valley. As early as 2009, the BLM learned of the cultural

significance of the Valley to Indian tribes.[7]  In November 2009, Archaeology Southwest "informed BLM of the cultural significance of the San Pedro Valley and its intact cultural and natural landscape."  The Consulting Parties also informed BLM that the Route through the San Pedro Valley "could significantly impact a landscape of significance to Native American groups."

In February 2018, under the terms of the PA, the BLM provided the Consulting Parties with a draft inventory report. It failed to identify the San Pedro Valley as a TCP.  But in August 2023, when the BLM approved the final Treatment Plan, the BLM stated that a second Treatment Plan would be developed "to address additional adverse effects . . . to tribally sensitive properties" and that the San Pedro Valley would be considered in the second Treatment Plan.  The Consulting Parties neither received nor were consulted on a second Treatment Plan that evaluated the San Pedro Valley.

In September 2023, the Department issued the "First LNTP," which authorized SunZia to "proceed with construction on segments of the project area crossing state and private lands in the San Pedro Valley."  The First LNTP explained:

> In accordance with the Section 106 Programmatic Agreement guiding the cultural compliance activities, . . . the cultural

---

[7] The Department argues that comments received before the PA's execution are "irrelevant to the issue of [the Department's] ongoing compliance with the [PA]."  But the Department does not cite any part of the PA supporting that position.  And as noted above and discussed below, the PA provides generally, without any timing limitations, that "[f]or properties that have traditional cultural values, the BLM shall take into consideration values expressed by the consulted tribes."

> inventory report has been accepted by the BLM and there are no historic properties present in the transmission structure spans and roads subject to this LNTP. Your request for this LNTP is granted and you may proceed with construction activities in these areas upon receipt of this letter.

The next month, in October 2023, some Plaintiffs informed the Department that the First LNTP had been based on "a flawed and incomplete historic property inventory report," as it omitted "the presence of [TCPs] and of the cultural salience of the San Pedro Valley as a whole." In response, the Department, in early November 2023, suspended all activities authorized under the First LNTP. After meeting with some Plaintiffs to discuss their concerns, the Department issued the "Second LNTP" in late November 2023. The Second LNTP stated:

> The BLM believes it is appropriate to continue the process of evaluating San Pedro Valley as a potential traditional cultural property (TCP) through consultation; however, the BLM has determined that the timing of the information provided by the Tribes relative to the many years the consulting parties worked towards completing the steps of the PA process and a treatment plan does not support pausing portions of the Project until the BLM evaluates and considers an amendment or addendum to the treatment plan to cover San Pedro Valley. . . . [T]he BLM hereby lifts the immediate temporary suspension of all

> activities within San Pedro Valley. SunZia, LLC is authorized to continue activities consistent with the [First LNTP] . . . .

Pursuant to the LNTPs, SunZia started construction activities in the San Pedro Valley.[8]

### C. Procedural History

In January 2024, Plaintiffs filed their complaint for declaratory and injunctive relief under the APA against the Department. Plaintiffs claimed that the Department violated the NHPA by authorizing Project construction to begin in the San Pedro Valley before completing its NHPA obligations. The complaint sought, among other things, a declaration that the Department violated the NHPA in issuing the LNTPs and that the "LNTPs and underlying right-of-way authorization for the Project in the middle and lower San Pedro Valley" are unlawful. The complaint also sought to enjoin the Department from authorizing construction in the Valley pending a legally adequate NHPA Section 106 process. The district court granted SunZia's motion to intervene as a defendant.

Shortly after filing the complaint, Plaintiffs moved for a preliminary injunction to halt construction of the Project in

---

[8] At oral argument, counsel for SunZia stated that much of the Project in the Valley has been completed. Oral Arg. at 41:38–52. But the parties agree that this construction does not moot the case, as Plaintiffs may still seek mitigation measures. Oral Arg. at 42:00–12, 43:24–44:10. We agree. *See Tyler v. Cuomo*, 236 F.3d 1124, 1137 (9th Cir. 2000) (holding that the case was not moot because, although the project had been completed, "changes c[ould] still be made to help alleviate any adverse effects"). We express no view on the type of mitigation measures that remain available to Plaintiffs, as that issue is not before us. *See* Oral Arg. at 42:12–20, 44:10–16.

the Valley. In ruling on the motion, the district court determined that Plaintiffs had raised two claims: (1) a challenge to the ROD and (2) a challenge to the Department's compliance with the terms of the PA. The district court reasoned that the first challenge was barred by the APA's six-year limitations period under 28 U.S.C. § 2401(a). *See Corner Post, Inc. v. Bd. of Governors*, 603 U.S. 799, 807 (2024) (applying § 2401(a) to a cause of action under the APA). And the district court decided that Plaintiffs were unlikely to succeed on their second challenge. In making that determination, the district court appropriately relied on materials submitted with the filings on the preliminary injunction motion. Because the district court found that Plaintiffs failed to show a likelihood of success on their claims, it denied the motion.

The district court then granted Defendants' motions to dismiss under Rule 12(b)(6). The district court construed the complaint as raising the same two claims that the court had considered in denying the preliminary injunction. As in its order denying the preliminary injunction, the district court explained that any challenge to the ROD was time-barred. The court also determined, relying on its analysis in its order denying the preliminary injunction, that Plaintiffs had not plausibly alleged that the BLM violated the PA:

> To the extent that Plaintiffs claim that the BLM failed to satisfy the pre-construction conditions outlined in the PA, the Court, in its Order on Plaintiffs' Motion for Temporary Restraining Order/ Preliminary Injunction, concluded that Plaintiffs were unlikely to succeed on the merits of this argument. (Doc. 56 at 13-21.) Plaintiffs do not plausibly

allege that the BLM failed to comply with the PA.

The district court issued an order granting the motions to dismiss and denying leave to amend based on futility. Plaintiffs timely appealed from that order.

## II. STANDARD OF REVIEW

We review de novo a district court's grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013). "All well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* "To survive a motion to dismiss, a complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## III. DISCUSSION

The issue before us is whether the district court erred in granting the motions to dismiss. To decide that issue, we must answer three questions: (A) What exactly do Plaintiffs challenge? (B) Are Plaintiffs' challenges reviewable and timely under the APA? (C) If Plaintiffs' challenges are reviewable and timely under the APA, have they stated a plausible claim for relief? We answer each question below and conclude that the district court erred in granting the motions to dismiss.

## A.  Plaintiffs' Challenge

Construed in Plaintiffs' favor, the complaint raises two NHPA challenges. First, Plaintiffs allege that the right-of-way grant under the ROD violated the NHPA. Second, they

allege that the Department violated the NHPA by failing to satisfy certain of its obligations under the PA.

On appeal, however, Plaintiffs expressly disclaim *any* challenge to the ROD or the terms of the PA and so abandon their first challenge.  For example, their reply brief states that "Plaintiffs have *always* maintained that they *do not* challenge the ROD, BLM's NEPA process, or the terms of the PA itself."  Plaintiffs' reply brief also explains that their only challenge is to the BLM's "*implementation* of the PA post-ROD."  Thus, Plaintiffs' only preserved challenge is whether the Department failed to meet certain of its NHPA obligations under the PA.

SunZia appears to suggest that this challenge is an improper collateral attack on the ROD because it could result in alteration of the Route.  But the ROD itself, by incorporating the terms of the PA, contemplated that future decisions under the PA could alter the Route.  The PA states that "realignment of the transmission line" may be necessary to avoid adverse effects on historic properties. [9]  Thus, realigning the Route under the PA to avoid such adverse effects would be consistent with the ROD.

Further, although parts of the complaint could be interpreted otherwise, Plaintiffs have clarified that they do not seek to force the Project to avoid the entire San Pedro Valley.  Instead, they "merely request that the Court ensure BLM fulfills [its] NHPA obligations."  This assertion aligns with the remedies expressly sought in the complaint (putting

---

[9] The parties dispute the extent of any "realignment" required under the PA.  But for purposes of determining whether Plaintiffs' challenge is an improper collateral attack on the ROD, we need not (and do not) define "realignment" under the PA.  Regardless of the term's precise meaning, the ROD incorporated the terms of the PA.

aside the remedies related to the right-of-way grant under the ROD that Plaintiffs have abandoned).  The complaint asks the court to declare unlawful and set aside the LNTPs and to enjoin the Department from authorizing construction until the Department has satisfied its NHPA obligations under the PA.  That remedy would not affect the validity of the ROD because the ROD itself, by incorporating the PA's terms, contemplated that the Department would have to satisfy its NHPA obligations under the PA before authorizing construction.  *See Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155, 1159–60 (9th Cir. 2012) (per curiam) (explaining that the action was not an improper collateral attack on an agency-issued license because the remedy would be an injunction requiring a full NEPA analysis, which would "have no effect on the validity of [the] license").

### B.  Reviewability and Timeliness Under the APA

Plaintiffs bring their NHPA challenge under the APA. *See San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005).  The APA allows judicial review only of a "final agency action."  5 U.S.C. § 704.  A challenge to a final agency action must be brought "within six years after the right of action first accrues."  28 U.S.C. § 2401(a); *see also Corner Post*, 603 U.S. at 807.  "A claim accrues when the plaintiff has the right to assert it in court—and in the case of the APA, that is when the plaintiff is injured by final agency action."  *Corner Post*, 603 U.S. at 804.

Defendants argue that we cannot review Plaintiffs' NHPA claim because the LNTPs are not final agency actions.  But if they do constitute final agency actions, Defendants do not dispute that the NHPA claim would be

timely. **[10]**   Thus, the key issue is whether the LNTPs constitute final agency actions.

"For an agency action to be final, the action must (1) 'mark the consummation of the agency's decisionmaking process' and (2) 'be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).   "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).   The court "focus[es] on the practical and legal effects of the agency action: [t]he finality element must be interpreted in a pragmatic and flexible manner." *Oregon Nat. Desert Ass'n*, 465 F.3d at 982 (quotation marks omitted) (quoting *Oregon Nat. Res. Council v. Harrell*, 52 F.3d 1499, 1503 (9th Cir. 1995)).

Under the PA, the BLM decides whether to authorize SunZia to begin construction.   As relevant here, if the BLM accepts the final inventory report and determines that "there are no historic properties present," that all adverse effects to historic properties will be avoided, or that treatments to mitigate adverse effects to historic properties have been completed, then it "may authorize [SunZia] to begin construction."   The PA also provides that requests to authorize construction "will be approved only if such authorizations will not restrict subsequent measures to

---

[10] If the LNTPs constitute final agency actions, Plaintiffs' NHPA claim would be timely with regard to either LNTP.   Thus, we need not decide whether the statute of limitations started to run when the First or the Second LNTP issued.   *See* Oral Arg. at 2:35–3:06.

avoid, minimize or mitigate the adverse effects to historic properties through rerouting of the corridor, or placement of ancillary facilities."

The LNTPs represent the Department's final determination that these requisite conditions have been satisfied. On their face, the LNTPs "mark the consummation of the agency's decisionmaking process," *Oregon Nat. Desert Ass'n*, 465 F.3d at 982 (quoting *Bennett*, 520 U.S. at 178), about whether there are historic properties present in the San Pedro Valley. The First LNTP states: "[T]he cultural inventory report has been accepted by the BLM and *there are no historic properties present* in the transmission structure spans and roads" on "segments of the project area crossing state and private lands in the San Pedro Valley." (emphasis added). The Second LNTP essentially reissued the First LNTP that had been suspended. The LNTPs also represent the agency's final determination that construction will not restrict subsequent mitigation measures to protect historic properties, as such a determination was a prerequisite to authorizing construction under the PA.

The LNTPs also determine "rights." *Oregon Nat. Desert Ass'n*, 465 F.3d at 982. Most importantly, they expressly grant SunZia the right to begin construction in the San Pedro Valley.

Defendants' counterarguments are unpersuasive. They argue that the ROD is the only final agency action relevant here and that the LNTPs merely implement the ROD. But the ROD did not decide whether the PA requirements had been satisfied. Indeed, the ROD stated that "the identification and evaluation process provided in the PA will be completed *after the ROD* and right-of-way permit are issued, but prior to Project construction." (emphasis added).

Logically, the ROD could not have marked the consummation of the Department's NHPA process under the PA; that process was incomplete when the ROD was issued.[11]

Defendants also argue that the ROD is the final agency action because it established the Route, which is what Plaintiffs really challenge. But this argument mischaracterizes Plaintiffs' claim. As discussed above, Plaintiffs have clarified that they do not challenge the Route as established under the ROD. Rather, they "request that the Court ensure BLM fulfills [its] NHPA obligations" under the PA. We also think that Defendants' argument relies on an incorrect premise: that the ROD finally determined the Route *for all purposes*. While the ROD granted a right-of-way over the Route and determined that the Route complied with certain requirements, the ROD expressly stated that it remained subject to various terms and conditions, including those in the PA. In turn, the PA sets forth the Department's post-ROD obligations under the NHPA and contemplates that the Department may need to "realign[] . . . the transmission line." The ROD therefore could not have determined that the Route was fixed and final for NHPA purposes.

In sum, we hold that the LNTPs constitute final agency actions because they represent the Department's final decision that the PA requirements had been satisfied, and

---

[11] During oral argument, counsel for the Department agreed that the LNTPs were the first time that the Department had informed Plaintiffs that the PA requirements had been satisfied. Oral Arg. at 32:38–33:34. This statement supports the conclusion that the ROD *could not* have been the final determination of whether the PA requirements had been satisfied.

that SunZia could therefore begin construction in the San Pedro Valley.[12]  Plaintiffs' NHPA claim, which pertains to the LNTPs, is thus reviewable and timely under the APA. *See* 5 U.S.C. § 704; 28 U.S.C. § 2401(a).

## C.  Plausible Claim for Relief

The district court concluded that Plaintiffs had failed to "plausibly allege that the BLM failed to comply with the PA."  But in reaching that determination, the district court relied solely on its order denying the preliminary injunction motion, in which it found that "Plaintiffs were unlikely to succeed on the merits" of their claim for any alleged PA violation.  This conclusion was erroneous, as it resulted in the district court applying to the motions to dismiss the more burdensome likelihood-of-success standard used for motions for preliminary injunctions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("The plausibility standard [for a motion to dismiss] is not akin to a 'probability requirement[]' . . . ." (quoting *Twombly*, 550 U.S. at 556)); *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020) ("[D]emonstrat[ing] a reasonable likelihood of success on

---

[12] For this reason, we need not consider Plaintiffs' alternative argument that, even if the ROD were the only final agency action, Plaintiffs' injury occurred when the LNTPs were issued and thus their claim is timely under *Corner Post*.  *Corner Post* held that the statute of limitations on an APA claim begins to run only when there is final agency action *and* the plaintiff suffers an injury from such action.  603 U.S. at 809 ("An APA plaintiff does not have a complete and present cause of action until she suffers an injury from final agency action, so the statute of limitations does not begin to run until she is injured."); *see also id.* at 813 ("Because injury, not just finality, is required to sue under the APA, [the plaintiff]'s cause of action was not complete and present until it was injured by [the final agency action].").

[a] claim[ is] a heavier burden than . . . pleading [a] plausible claim necessary to avoid dismissal.").

Further, by relying on its order denying the preliminary injunction, the district court considered documents that may not be considered at the motion-to-dismiss stage. *See Mauia*, 5 F.4th at 1071 (explaining that, on a motion to dismiss, courts may consider only the complaint, documents incorporated by reference into the complaint, and matters of which the court may take judicial notice).

In its brief, the Department argues that Plaintiffs identify no document that the district court improperly considered.[13] But the district court's orders speak for themselves. As was appropriate and required in ruling on the preliminary injunction motion, the district court's order cited and considered several documents, including declarations from an archaeologist hired by the Project's environmental contractor and from a BLM employee who was "assigned as the BLM Cultural Resources lead for the SunZia Project." But then, the district court, in ruling on the motions to dismiss, expressly relied on only that order in determining that Plaintiffs had failed to allege a plausible PA violation. In so doing, the district court necessarily considered documents that it could not consider on a motion to dismiss.

Applying the correct standard and relying on the appropriate documents, the complaint states a plausible violation under the PA. Construing the allegations in Plaintiffs' favor, we conclude that the BLM has violated the PA in at least two ways. First, since at least 2009, the BLM

---

[13] At oral argument, though, counsel for the Department seemed to agree that the district court improperly relied on the preliminary injunction record in granting the motions to dismiss. Oral Arg. at 25:40–50.

knew that the tribes considered the San Pedro Valley to be a TCP. Indeed, the BLM assured the Consulting Parties (which included three of the Plaintiffs) that it would evaluate the Valley under a second Treatment Plan. But the BLM then failed to provide a second Treatment Plan to the Consulting Parties. These allegations raise a plausible claim that the BLM violated the PA's requirement that the BLM consult with the Consulting Parties by providing them with a copy of the Treatment Plan for review and comment.

Second, before authorizing construction, the PA requires the Department to determine that there are no historic properties present, that there will be no adverse effects to historic properties, or that treatment has been completed to mitigate any adverse effects. Because Plaintiffs plausibly allege that the Valley is a TCP, we must infer that a proper consultation via the Treatment Plan process would have resulted in the Valley's designation as a historic property. (Recall that under the PA, the Treatment Plan may be used to determine whether a cultural resource affected by the Project should be designated as a historic property.) As claimed by Plaintiffs, however, the Department authorized construction without properly identifying the Valley as a TCP. This allegation raises a plausible claim that the Department violated the PA's requirement that—before authorizing construction—it properly identify all historic properties affected by the Project and avoid, minimize, or mitigate adverse effects.

The Department's primary counterargument is that, because none of the Consulting Parties raised a timely objection in response to the draft inventory report, the final inventory report—which excluded the San Pedro Valley as a historic property—controls and forecloses Plaintiffs'

challenge.  But at this stage in the proceedings, that argument is unconvincing for several reasons.

First, it is unclear whether the Consulting Parties had to make a formal written objection to the draft inventory report to trigger the Department's obligation to consider whether the San Pedro Valley is a historic property.  While the PA states that written comments to the draft inventory report must be provided within sixty days and that the BLM shall consider such written comments, the PA also states more generally, without any timing limitations, that "[f]or properties that have traditional cultural values, the BLM shall take into consideration values expressed by the consulted tribes."  According to the complaint, the BLM learned of the cultural significance of the Valley to the tribes as early as 2009.  So regardless of any comments received in direct response to the draft inventory report, the Department may have needed to consider whether the Valley should have been recognized as a historic property.  Further, the Department allegedly told the Consulting Parties that it would evaluate the adverse effects on the Valley during the Treatment Plan process.  These circumstances all suggest that the Department may have had to evaluate whether the Valley was a TCP, regardless of whether the Department had received an objection to the exclusion of the Valley from the draft inventory report.

Second, it is unclear whether the PA bars Plaintiffs from objecting to the inventory report after the sixty-day comment period.  The PA allows any Consulting Party to "object *at any time to any actions* proposed or the manner in which the terms of th[e] PA are implemented," and provides a dispute resolution process to resolve such objections. (emphasis added).  This provision suggests that Plaintiffs' objection to the omission of the Valley from the inventory report was not

barred under the PA. Indeed, the Second LNTP suggests that Plaintiffs' objection was not barred under the PA. The Second LNTP states that the "BLM believes it is appropriate to continue the process of evaluating San Pedro Valley as a potential [TCP] through consultation."

Finally, even if Plaintiffs' objection to the omission of the Valley from the draft inventory report came too late and the report had been properly prepared, the PA contemplates that the final inventory report may not identify all historic properties. The Treatment Plan process—which occurs after the inventory phase—can be used to assess whether cultural resources for which historic property designations could not be made during the inventory process should be designated as historic properties after additional consideration. The BLM assured Plaintiffs that it would evaluate the adverse effects on the Valley during the Treatment Plan process. Construing all of this context in Plaintiffs' favor suggests that the BLM had to evaluate the Valley during the Treatment Plan process and that the final inventory report is therefore not dispositive as to whether the Department correctly omitted the Valley as a TCP.

In sum, Plaintiffs have plausibly alleged that the Department violated the NHPA by failing to comply with the PA. For this reason, we need not address Plaintiffs' alternative argument that they should be granted leave to amend if their complaint fails to state a claim. However, Plaintiffs are not foreclosed from seeking leave to amend on remand, and the district court should freely grant Plaintiffs the ability to amend.

## IV. CONCLUSION

Plaintiffs have raised a plausible claim that the Department violated its NHPA obligations under the PA,

and their claim is reviewable and timely under the APA. The district court erred in granting the motions to dismiss.

**REVERSED AND REMANDED.**